N O T   F O R   P U B L I C A T I O N

FILED & ENTERED

MAR 14 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Ogier        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>SHAHEN MARTIROSIAN,<br><br>          Debtor.<br>_____<br><br>VAZGEN KACHATRYAN,<br><br>      Plaintiff,<br><br>        vs.<br><br>SHAHEN MARTIROSIAN, VIRGINIA MARTIROSIAN, ANAHIT HARUTYUNYAN, CPI REAL ESTATE GROUP, INC. dba REALTY EXECUTIVES PREMIERE ESCROW DIVISION, 4705 EXCELENTE INC., CITY NATIONAL FINANCE,<br><br>      Defendants. | **Case No.: 1:15-bk-11139 -MB**<br><br>**Chapter 7**<br><br>**Adv. Proc. No.  1:16-ap-01091-MB**<br><br>**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**<br><br>Hearing<br><br>Date:  February 1 & 13, 2017<br>Place: Courtroom 303<br>       21041 Burbank Blvd<br>       Woodland Hills, CA 91367 |

On December 27, 2016, the Court held an evidentiary hearing on Plaintiff's motion for injunctive relief (the "TRO Hearing"). The same day, the Court entered its *Temporary Restraining Order, Order to Show Cause Regarding Issuance of a Preliminary Injunction, and Order Directing Defendants and Other Parties to Appear* (the "TRO"). Adv. Dkt. 31. The TRO restrained and enjoined defendants and their agents from foreclosing on, enforcing any deed of trust against, or otherwise facilitating the transfer of the real property commonly known as 4705 Excelente, Woodland Hills, California (the "Property"), through the completion of the hearing on a preliminary injunction.

On February 1 and 13, 2017, the Court held an evidentiary hearing on whether to extend the injunctive relief in the TRO, in the form of a preliminary injunction, through and including the completion of a trial in this adversary proceeding (the "Injunction Hearing"). After reviewing and considering the declaration testimony submitted by the parties, the live testimony adduced at the Hearing (as to which the Court had the opportunity to observe the demeanor of the witnesses and make assessments of their credibility), and all admitted documentary evidence, the Court finds that good cause exists to grant the preliminary injunction. The following constitute the Court's findings of fact and conclusions of law for purposes of Federal Rule of Bankruptcy Procedure 7052.

# I. PROCEDURAL BACKGROUND

On April 2, 2015, Defendant Shahen Martirosian (the "Debtor" or "Shahen")[1] filed a voluntary chapter 7 petition commencing the above-referenced bankruptcy case. Case Dkt. 1. Thereafter, Amy L. Goldman was appointed chapter 7 trustee for the Debtor's estate (the "Trustee"). On April 10, 2015, the Debtor filed his Schedules of Assets and Liabilities and Statement of Financial Affairs ("Schedules"). Case Dkt. 19. In his Schedules, the Debtor asserted that he owned the Property in "fee simple," that it was worth $700,000, and that the secured claims against it exceed $2 million. *Id.* at 6. The Debtor also disclosed some personal property that he

---

[1] Because there are multiple parties with the surname Martirosian, the Court will refer to the Martirosians by their first names to ensure clarity. No disrespect is intended.

1    claimed was worth $12,848 and that he claimed was exempt from the estate.  *Id.* at 7-10.  The

2    Schedules do not disclose Plaintiff as a creditor of the Debtor.

3            On May 15, 2015, the Trustee filed a "no asset report," indicating her conclusion that there

4    was no property available for distribution from the estate, over and above that which was exempted

5    by law.  On September 15, 2015, the Court granted the Debtor a discharge and, on September 22,

6    2015, closed the bankruptcy case.  On April 5, 2016, on the motion of the plaintiff in another

7    adversary proceeding now pending against the Debtor, the Court reopened the Debtor's bankruptcy

8    case.  Case Dkt. 71.

9            On June 24, 2016, Plaintiff Vazgen Khachatryan ("Plaintiff" or "Khachatryan") filed his

10   complaint commencing this Adversary Proceeding (the "Complaint").  Adv. Dkt. 1; Case Dkt. 79.

11   The Complaint identifies the following Defendants: (i) the Debtor, (ii) his wife Virginia

12   Martirosian ("Virginia"), (iii) Anahit Harutyunyan ("Harutyunyan"), (iv) CPI Real Estate Group,

13   Inc. ("CPI") dba Realty Executives Premiere Escrow Division, 4705 Excelente Inc. ("Excelente

14   Inc."), and City National Finance ("CNF").

15           The Complaint asserts five causes of action:

16        1.   Determination of a nondischargeable debt against the Debtor under Bankruptcy Code

17              sections 523(a)(3) and 523(a)(4), on account of a breach of fiduciary duty [asserted

18              against the Debtor and CPI];

19        2.   Determination of a nondischargeable debt against the Debtor under Bankruptcy Code

20              sections 523(a)(3) and 523(a)(6), on account of a conversion [asserted against the

21              Debtor and CPI];

22        3.   Fraudulent transfer [asserted against the Debtor, Virginia, Harutyunyan and Excelente,

23              Inc.];

24        4.   Cancellation of instruments [asserted against the Debtor, Virginia, Harutyunyan,

25              Excelente Inc. and CNF]; and

26        5.   Fraud [asserted against the Debtor and CPI].

27           On July 18, 2016, the Debtor, Virginia, Harutyunyan and Excelente Inc. filed their answer,

28   denying the allegations contained in the Complaint and asserting affirmative defenses.  Adv. Dkt.

3

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1   4.  CNF initially defaulted on the Complaint, but that default subsequently was vacated.  Adv. Dkt.

2   19.  On October 27, 2016, CNF filed its answer denying liability on the Complaint and asserting its

3   affirmative defenses.

4        On December 22, 2016, Plaintiff filed his motion seeking to restrain and enjoin the sale of

5   the Property.  The Court held the TRO Hearing on December 27, 2016, and entered its TRO on the

6   same date.  The Court thereafter held the Injunction Hearing on February 1 and 13, 2017.  The

7   Court continued the matter until February 16, 2017, in order to consider the matter further and

8   prepare this Memorandum.  Adv. Dkt. 17.  On February 16, 2017, the Court held a telephonic

9   hearing to announce its ruling.

10        At the outset of the Injunction Hearing, Plaintiff objected to the Court's consideration of the

11   Declaration of Khorin Salmassian ("Salmassian Declaration"), filed one-day before that hearing.

12   *See* Adv. Dkt. 47; Adv. Dkt. 48; Transcript, February 1, 2017 at 5:2- 5:12.  After hearing argument

13   from the parties, the Court struck the Salmassian Declaration because it was filed one week late

14   under the procedures established by the Court and agreed to by the parties, and therefore

15   constituted unfair surprise.  Transcript, February 1, 2017 at 5:13-10:4.  The Court, however, noted

16   that its ruling did not preclude Salmassian from being called as a rebuttal witness, if appropriate.

17   *Id.* at 9:25-10:3.  Salmassian later testified as a rebuttal witness.  *Id.* at 102-140.

18   **II. JURISDICTION**

19        The Court has jurisdiction over this Adversary Proceeding and the request herein for

20   preliminary injunctive relief.  The Complaint contains causes of action alleging Plaintiff holds a

21   non-dischargeable debt against the Debtor pursuant to Bankruptcy Code sections 523(a)(3), (4) and

22   (6).[2]  Section 1334(b) of title 28, together with the District Court's general order referring

23   bankruptcy matters to this Court, grants this Court jurisdiction over "all civil proceedings arising

24   under title 11, or arising in or related to cases under title 11."  The nondischargeability claims arise

25

26   [2]  Although the Complaint does not refer to Bankruptcy Code section 523(a)(2), the Court finds
   that the allegations contained in the Complaint adequately plead a cause of action under that statute

27   as well.

28

1   "under" title 11.  Further, because these are core claims, the Court has the constitutional authority

2   to enter final judgment on them.

3        The other claims pled in the complaint—for breach of fiduciary duty, conversion,

4   fraudulent transfer, cancellation of instruments and fraud—arise under state law.  These claims,

5   however, share a common nucleus of operative facts with Plaintiff's nondischargeability claims.

6   As such, the Court has supplemental jurisdiction over the remaining claims in the Complaint.  *See*

7   *In re Pegasus Gold Corp.* 394 F.3d 1189, 1192, 1194–95 (9th Cir. 2005) (citing *United Mine*

8   *Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *In re Caracciolo*, 2006 WL 6602238, at *2, 5

9   (Bankr. S.D. Cal., July 19, 2006).  The Court also has the constitutional authority to enter final

10  judgment on them.  *See Deitz v. Ford (In re Dietz)*, 469 B.R. 11, 17-25 (B.A.P. 9th Cir. 2012).

11  **III.  FACTUAL BACKGROUND**

12  **A. The Investment Scheme.**

13       In June of 2014, the Debtor approached Plaintiff offering to provide real estate investment

14  services.  Dkt. 22 at 200 (¶¶ 2, 3).  The Debtor represented that he was a professional real estate

15  broker and owner of "Realty Executive Premiere."  *Id.*  The Debtor represented to Plaintiff that he

16  could arrange Plaintiff's purchase of a property in Chatsworth, California for $350,000.  *Id.*  The

17  Debtor thereafter presented Plaintiff with a purchase contract for 10000 Lubao Avenue,

18  Chatsworth, California, and requested that Plaintiff remit the purchase consideration to "Realty

19  Executives Premiere Escrow Division" for the exclusive purpose of purchasing the Chatsworth

20  property.  *Id.*

21       In October and November of 2014, Plaintiff provided checks to the Debtor and wired funds

22  totaling at least $350,500, payable to the order of Realty Executive Premiere.  *Id.* at 200 (¶ 4), 204-

23  206 (Ex. A).  At the time, the Debtor represented to Plaintiff that Realty Executives Premiere

24  Escrow Division was a bona fide escrow company owned by the Debtor and was going to facilitate

25  Plaintiff's purchase of the Chatsworth property.  *Id.*  The transactions never closed.  After months of

26  excuses and delays given by the Debtor, Plaintiff learned that there was no pending property

27

28

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1   purchase and that the purported transaction was a sham. *Id.* at 201 (¶ 7).  The Debtor ultimately

2   admitted to Plaintiff that the Debtor had taken Plaintiff's funds for his own use. *Id.* at 201 (¶ 9).[3]

3   **B. The Fraudulent Transfer Scheme.**

4       The Debtor also admitted to Plaintiff that the Property—where the Debtor and his wife

5   Virginia have lived for 16 years and continue to do so—had been sold in order to keep it out of

6   reach of the Debtor's creditors. *Id.*  Indeed, through a series of transfers and transactions, the

7   Martirosians have intentionally sheltered the Property from enforcement action by their creditors,

8   including Plaintiff.

9       This effort began no later than November 20, 2013, when the Debtor recorded an

10  Interspousal Transfer Grant Deed, transferring his interest in the Property to Virginia, as her sole

11  and separate property.  Adv. Dkt. 22 at 197-199 (Ex. O to Malek Declaration).[4]  Virginia furthered

12  the scheme by orchestrating a short sale of the Property to Defendant Harutyunyan on July 24,

13  2015, and immediately leasing the Property back for the benefit of herself and her husband. *See*

14  _____

15  [3]  When questioned about these matters at the Injunction Hearing on February 13, 2017, the Debtor
    refused to answer based on his Fifth Amendment right against self-incrimination  The Court draws
16  a negative evidentiary inference from the Debtor's refusal to answer these questions. *See Doe ex
    rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).  The questions the Debtor
17  refused to answer include: (i) whether the Debtor was plaintiff's real estate agent, (ii) whether the
    Debtor is an owner of Realty Executive Premier Escrow, (iii) whether the Debtor had seen, issued
18  and signed the receipts offered by Plaintiff to show his escrow deposits, (iv) whether the Debtor
    received the money remitted by Plaintiff, (v)  whether he used the funds for gambling, (vi) whether
19  he used the funds to pay off personal debts, (vii) whether he used the funds to pay off the mortgage
    for the Property, and (vii) whether he gave the funds to his wife.  In each instance, the Court infers
20  that the Debtor's answer to these questions would have been damaging to him.
21
22  [4]  There is some evidence to suggest that were several transfers of interests in the Property between
    the Debtor and Virginia prior to the November 20, 2013 Interspousal Transfer Deed, but the
23  evidence of such transfers requires further development.  For instance, a preliminary title report
    dated June 29, 2015, offered by CNF, suggests that on May 2, 2013, the Debtor transferred the
24  Property, as his sole and separate property, to himself and Virginia, as community property.  Dkt.
    45 at 19.  The same title report also suggests that in 2007, the Property was held by Virginia as her
25  sole and separate property, and that she was the sole trustor under the prior deeds of trust. *Id.* at
    15-16 (description of 2007 deeds of trust pertaining to loans by Countrywide Home Loans, Inc.
26  (later assigned to Nationstar Mortgage) and Chase Bank USA, N.A.).
27
28

1   Dkt. 1 at 27-29 (grant deed), Plaintiff's Ex. 6 (residential purchase agreement); Plaintiff's Ex. 10

2   (residential lease).  The $600,000 short sale purchase price was financed by CNF, which now seeks

3   to foreclose on its deed of trust against the Property.  *See* Plaintiff's Exs. 4, 5 (promissory notes for

4   $600,000 and an additional $108,000 respectively).

5           As explained more fully below, the totality of the circumstances support the conclusion that

6   none of these transactions were made at arms' length, that Harutyunyan is a straw buyer working in

7   collusion with the Martirosians, and that the transfers of the Property (i.e., from the Debtor to

8   Virginia, and subsequently from Virginia to Harutyunyan), were part of a scheme intended to

9   hinder, delay or defraud the creditors of the Debtor.  The evidence is circumstantial but substantial.

10          **1.   The Debtor's Chapter 7 Case**

11          In direct contradiction with the Debtor's recorded transfer of 100% of the Property to

12  Virginia on November 20, 2013, the Debtor filed his bankruptcy case on April 2, 2015, claiming

13  that *he* was the sole owner of the Property. Case Dkt. 1, 19 at 6 (Schedule A). [5]  The Debtor further

14  asserted in his Schedules that the Property was worth $700,000 and that it was substantially

15  overencumbered by claims exceeding $2 million *Id.*

16          By falsely asserting that he was the owner of the Property, and treating it as property of his

17  estate, the Debtor was able to use his bankruptcy to remove liens from the property.  On April 10,

18  2015, the Debtor filed motions seeking to avoid each of three judicial liens encumbering the

19  Property in the aggregate amount of approximately $50,000, pursuant to Bankruptcy Code section

20  522(f).  *See* Case Dkt. 16-18.  Although these motions were initially denied without prejudice, they

21  subsequently were refiled, and ultimately granted by the Court.  *See* Case Dkt. 26-28, 34-36, 41,

22  53, 54.

---

25  [5]  This was the third bankruptcy case filed by the Debtor in this district in recent years.  *See* Case
26  No. 12-20131 (chapter 7 case filed on November 16, 2012 and dismissed on March 13, 2013); Case
    No. 12-14089 (chapter 13 case filed on May 2, 2012, thereafter converted to chapter 7, and
27  dismissed on August 24, 2012).

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

During the same timeframe, Virginia, the record titleholder and the sole trustor under the two deeds of trust encumbering the property,[6] obtained authority from her lenders to conduct a short sale of the Property to Harutyunyan for $600,000. *See, e.g.,* Adv. Dkt. 45 at 22-23 (June 19, 2015 letter from Nationstar Mortgage to Virginia approving short sale). She also obtained a conditional commitment from the Internal Revenue Service to discharge the federal tax lien against the Property, on the premise that there was no equity in the Property. *Id.* at 45 (May 22, 2015 letter from the I.R.S. to Virginia).

The efforts of the Debtor and Virginia—including the Debtor's commencement of a chapter 7 case and his false representation to the Court regarding ownership of the Property—were part of a coordinated effort to remove all of the liens from the Property. First, the appraisal offered to support the *Debtor's* motions under Bankruptcy Code section 522(f) states that it was prepared for *Virginia* in connection with short sale negotiations. *See* Case Dkt. 8, 16. Second, the Statement of Financial Affairs filed by the Debtor on April 10, 2015 purports to identify the short sale of the Property as a repossession, foreclosure or return of property of the debtor that had occurred "within one year immediately preceding the commencement of the case." Dkt. 19 at 28. This statement was clearly false because the short sale had not occurred and did not occur until **three months after** the petition date, on July 25, 2015. But this representation underscores the coordinated nature of these activities.

Further, the evidence reveals that the efforts of the Debtor and Virginia to remove the liens on the Property and facilitate a short sale were undertaken in the hope of ultimately regaining ownership of the Property in the future. The Court does not believe that the Debtor and Virginia would have undertaken the risk, expense and burden of these efforts—including the long-term credit impact of the Debtor's chapter 7 case and the risk that the Debtor's false statements under penalty of perjury would be discovered—only to walk away from the Property in a short sale. If

---

[6] *See* Adv. Dkt. 45 at 15-16 (description of 2007 deeds of trust pertaining to loans by Countrywide Home Loans, Inc. (later assigned to Nationstar Mortgage) and Chase Bank USA, N.A.).

1  the Debtor and Virginia were looking to discharge their personal liability and abandon the

2  Property, they both could have filed for relief under chapter 7 and simply walked away.  The more

3  plausible explanation for their conduct is that the Debtor and Virginia planned to facilitate a short

4  sale to a friendly buyer in the hope that she would enable them to maintain possession and

5  ultimately regain ownership of the Property.

6        **2.  Anahit Harutyunyan**.

7        The evidence adduced to date indicates that Harutyunyan was just such a buyer—not an

8  arm's-length purchaser of the Property, but rather a willing participant in a fraudulent transfer

9  scheme orchestrated by the Debtor and Virginia.  Harutyunyan is a seamstress living in Hollywood,

10 California.  She testified that she has lived in the same $1,200 per month apartment in Hollywood

11 for 11 years and that she makes $70,000 to $80,000 per year.  According to Harutyunyan, she

12 purchased the Property in a short sale for $600,000, incurred interest-only debt service to CNF of

13 $6,800 per month under a six-month hard-money loan, and leased the Property back to the

14 Martirosians for only $2,200 per month.  Harutyunyan testified that she planned to fix up the

15 property, resell it, and earn a substantial profit on the transaction.

16       But very little about this story was credible.  By incurring $6,800 per month in interest and

17 leasing back the property for only $2,200, Harutyunyan would generate a monthly deficit of

18 $4,600.  Assuming Harutyunyan's testimony regarding her salary is not exaggerated (which the

19 Court doubts based on its concerns regarding her credibility), the debt service would consume

20 most, if not all, of her disposable income after satisfaction of her $1,200 per month rent on the

21 Hollywood apartment.  This would leave nothing for  the allegedly substantial repairs necessary to

22 maximize the value of the Property.  Harutyunyan did not have the funds to make the $200,000

23 down payment on the $600,000 purchase of the Property (she financed 100%), did not have the

24 money to fund various impounds and fees in connection with the financing totaling $108,000 (she

25

26

27

28

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1  financed this additional amount), and did not have the funds to make improvements (she claims she

2  sought unsuccessfully to get an additional loan of $100,000 from CNF, but it never materialized).[7]

3  CNF's witness testified that until litigation commenced over Harutyunyan's failure to repay

4  the loan, CNF received timely payment of the $6,800 monthly interest.  Transcript, December 28,

5  2016 at  121:7-121:19 (Jamal Dawood).  There is absolutely no evidence to explain where

6  Harutyunyan obtained the money to make these payments, other than from the Martirosians.

7  Indeed, Harutyunyan and Virginia testified that they regularly went to the bank together to

8  facilitate these payments.  Virginia testified that she accompanied Harutyunyan only to assist as a

9  translator.[8]

10  But the evidence suggests otherwise.  Two cashier's checks from Wells Fargo Bank, made

11  payable to the order of City National Finance for $6,843.31, list Anahit Harutyunyan as the

12  "Remitter" but list Virginia Martirosian as the "Purchaser" of those cashier's checks.  Plaintiff's

13  Ex. 1 (dated October 15, 2015 and November 14, 2015).  Virginia testified that this must have been

14  a mistake, but the Court did not find her explanation credible.  Moreover, the cashier's checks list a

15  "Purchaser's Account" number that is not among the accounts identified as belonging to

16  Harutyunyan, but instead appears to belong to Virginia.[9]

17  _____

18  [7]  The witness on behalf of CNF, Jamal Dawood, testified that the Property would need an
investment of $500,000 to generate a net profit of $300,000 to $400,000 dollars.  It is not clear

19  whether his estimate of necessary repairs was overstated or whether Harutyunyan's request for
$100,000 was unrealistically low.  Either way she did not have the money.

20

21  [8]  Harutyunyan speaks Armenian and testified in Court with the assistance of a court-certified
translator.

22

23  [9]  The Purchaser's Account number is redacted but shows the last four numbers: "2902."  This
corresponds, in part, to the account number on an account application submitted to Wells Fargo by

24  Virginia. *See* Plaintiff's Ex. 11 (account application showing the last two numbers "02").  Although
the match of only two numbers ordinarily might not be enough to confirm that these redacted

25  numbers are referring to the same account, the Court finds this sufficient given the totality of the
circumstances.  At a minimum, the Purchaser's Account number on these two cashier's checks

26  does not appear to belong to Harutyunyan.  *See* Plaintiff's Ex. 3 (account application submitted by
Harutyunyan).

27

28

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

A third cashier's check admitted into evidence shows Anahit Harutyunyan as both the "Remitter" and the "Purchaser" but raises its own concerns. Plaintiff's Ex. 1 (dated September 15, 2015). The redacted "Purchaser's Account" number shows "9048," which corresponds to an account opened by Harutyunyan in the name of Defendant Excelente, Inc. (i.e., 4705 Excelente, Inc.). Harutyunyan claims she created Excelente, Inc. for the purpose of one day engaging in a clothing design business with Virginia and opened the account to facilitate that business. In essence, Harutyunyan testified that the corporate entity and the account had nothing to do with the Property.

But the court does not find Harutyunyan's testimony credible. The entity Excelente, Inc. was registered with the California Secretary of State on May 11, 2015, just four days after Harutyunyan signed her offer to purchase the Property. It was given the name of the address of the Property—4705 Excelente, Inc.—although she could not have known at the time that she would succeed in acquiring the Property and did not do so until July 25, 2015. Moreover, Harutyunyan did not give a credible explanation why she named her design business for the address of a piece of property that she had not yet acquired, or how this corporate entityof—which she was the sole owner—was needed to facilitate a joint venture with Virginia. Indeed, she acknowledged that ultimately she and Virginia never pursued a clothing design business.

It appears that the Excelente, Inc. entity and the Excelente, Inc. account were created to facilitate the purchase of cashier's checks and the transfer of funds from the Martirosians to Harutyunyan in furtherance of their fraudulent scheme. By accompanying Harutyunyan to the bank, Virginia could provide the cash necessary for Harutyunyan to obtain a cashier's check for $6,843.31, ensure that the check was made payable to City National Finance, and, at least with respect to the September 15, 2015 cashier's check, obtain a cashier's check that referenced only Harutyunyan and the Excelente, Inc. account number (but not Virginia). *See* Plaintiff's Ex. 1 (noting funding source of each cashier's check was "Cash").[10]

---

[10] When asked whether Virginia had access to the Excelente, Inc. account, Harutyunyan explained somewhat equivocally "If she asks me, I can allow her. We go together." Transcript, February 1,

(Continued...)

The Excelente, Inc. account at Wells Fargo has been used to facilitate other payments from Virginia to Harutyunyan. Harutyunyan testified that each month Virginia paid her over $2,800 for the payment due on a Mercedes-Benz garaged at the Property. Harutyunyan testified that the car was originally obtained by or for the benefit of her son, that her son no longer uses the car, that the Martirosians use the car, and that the Martirosians pay her for it. The bank statements for the Excelente, Inc. account confirm this activity, showing that the account received deposits each month totaling $2,700 to $3,000, that a payment of $2,680.74 was made each month to "MB Fin. Svcs," and that the residue of the funds were spent on groceries, dining, and entertainment. *See* Plaintiff's Ex. 9 (bank statements).[11]

Although Harutyunyan and Virginia attempted to downplay the significance of the Mercedes-Benz—contending that it had serious mechanical problems and was frequently in the shop for repairs—the Court was not persuaded. The evidence is clear that Virginia used the Excelente, Inc. account to funnel substantial sums to Harutyunyan for use of an automobile that was not titled in Virginia's name. These facts suggest a *pattern* of activity by which Harutyunyan enabled the Martirosians to enjoy the use of multiple valuable assets outside the reach of their creditors.

Myriad other facts and circumstances support the conclusion that the short sale to Harutyunyan was not an arm's length transaction, but instead part of a scheme to hinder, delay and/or defraud creditors.

_____

(...Continued)

2017 at 50:21-22. But signatory access to the account by Virginia would not have been necessary because Harutyunyan accompanied her on each visit to the bank, and because it appears that the cashier's checks were funded with cash.

[11] At the injunction hearing, Plaintiff attempted to determine exactly who facilitated and benefitted from these miscellaneous electronic payments and ATM withdrawals (including ATM withdrawals at the Barone casino). The evidence was not conclusive on this point, but the Court did not find this point essential, as it is undisputed that the account was used to pay for the Mercedes-Benz driven by Virginia and maintained at the Property.

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1     First, Harutyunyan cannot credibly explain how she learned of the opportunity to purchase

2 the Property.  Although both Harutyunyan and Virginia acknowledge having a pre-existing

3 relationship, Harutyunyan claims that she did not learn of the opportunity to purchase Virginia's

4 home from Virginia.  Instead, Harutyunyan claims that she was at the market one day when she

5 overheard some *strangers* talking about the Property.  *See* Transcript, February 1, 2017 at 42:16-

6 43:11.  She does not recall the name of the market or the date she overheard the conversation, but

7 claims that it was at that moment that she decided to explore purchasing the Property.  She further

8 claims that she did not learn that the Property belonged to Virginia until she arrived at the home for

9 a viewing and found Virginia living there.  The Court simply does not find Harutyunyan's story

10 credible.

11     Second, both Harutyunyan and Virginia testified that Virginia pays the $2,200 in rent each

12 month in cash.  Although it is perfectly legal to pay an obligation in cash, the Court finds it highly

13 unusual that Virginia would elect to pay a sum as substantial as $2,200 each month in cash.

14 Harutyunyan suggested that she uses these funds to pay "expenses for the house," Transcript,

15 February 1, 2017 at 95:24-25, but neither she nor any of the other Defendants provided any

16 documentary evidence to substantiate that this monthly "payment" is actually made, that the funds

17 are actually deposited in an account, or that they are actually used by Harutyunyan—either to

18 reduce her monthly interest obligation to CNF or pay any other expenses.  When questioned

19 whether she reports the $2,200 in cash as rental income for taxation purposes, Harutyunyan

20 suggested that she does not do so.  *See* Transcript, February 1, 2017 at 95:21-95:25.  That the

21 parties claim Virginia pays the rent in cash, which is inherently difficult to verify, casts substantial

22 doubt on whether the leaseback transaction is real and whether the "rental" payments are actually

23 made at all.[12]

24

25 

26 [12]  When questioned about the reason for the $2,200 amount, Harutyunyan testified that this was
the amount Virginia said she was able to pay.  *Id.* at 96:13-96:18.  Even if it is assumed that this

27 amount was actually paid to Harutyunyan each month, that the rental amount was dictated by
Virginia—without reference to any objective market criteria—further suggests that the sale and

28                                                                  (Continued...)

Third, several account statements and/or registered addresses that ostensibly should list Harutyunyan's address in Hollywood, instead list the 4705 Excelente address in Woodland Hills. For instance, Harutyunyan lists the Excelente address—an address at which she has never lived or maintained an occupancy—as her address for purposes of her registration of the Excelente, Inc. entity. Plaintiff's Ex.2. Harutyunyan similarly lists the Excelente address as her address for purposes of the Excelente, Inc. account maintained at Wells Fargo. Plaintiff's Exs. 3 (account application); 9 (bank statements). The Court finds these circumstances highly unusual for an arm's-length transaction between the parties, and instead more indicative of a scheme conceived of and facilitated by the Martirosians, who have lived and continue to live at the Excelente address.

Furthermore, although the Los Angeles Department of Water and Power ("DWP") bill for services provided at the Property is sent to the Property, see Plaintiff's Ex. 7 (utility bill), the Court finds it unusual that the account would be maintained in the name of Harutyunyan, who does not live at the Property or make use of public utilities there. Harutyunyan initially testified that she was surprised that the account was maintained in her name, but thereafter suggested it was done with her permission, as she recalled that both she and Virginia went to the DWP together. *See* Transcript, February 1, 2017 at 71:19-72:4. The Martirosians had lived at the Property for over a decade, would continue to occupy the Property as tenants, and would continue to be responsible for their utility charges. The lease between Harutyunyan and the Martirosians makes the Martirosians responsible for all utilities. Plaintiff's Ex. 10 at ¶9. Under these circumstances, it would not have been necessary to change the name on the DWP account. It appears that the parties made this change to minimize the Martirosians' formal connections to the Property and further the appearance that Harutyunyan was an independent, arm's-length purchaser.

_____

(...Continued)
leaseback arrangement was not an arm's-length transaction, but instead a sham orchestrated by Virginia.

**3. Valuation of the Property**.

A substantial portion of the evidence and argument at the TRO Hearing and Injunction Hearing was directed towards the value of the Property. CNF argues that there is no equity in the Property. CNF relies on this factual proposition to argue that Plaintiff would not suffer irreparable harm if denied injunctive relief and, even if relief were granted by the Court, that an undertaking is necessary to adequately protect its interest. The Court, however, rejects CNF's factual premise. On the record before it, the Court finds that there is a prospect of substantial equity value in the Property for the benefit of Plaintiff.

The only expert testimony provided to establish the value of the Property was provided by Daniel Bone, a state-certified appraiser, on behalf of the Plaintiff. *See* Adv. Dkt. 44 (Declaration of Daniel Bone). Even after he was cross-examined by CNF, the Court found Bone's testimony credible. After conducting a visit to the Property and a detailed appraisal of the Property, Bone concluded that the value of the Property is $1,500,000, ***after*** taking into account approximately $45,000 in necessary repairs to the Property.

The testimony established that a structural engineering report was prepared by Robert Mayer, suggesting a series of recommended repairs to the Property, and that a contractor's estimate of the cost of those repairs was thereafter provided to Bone, the appraiser. Mayer submitted his expert testimony regarding the extent of the necessary repairs. *See* Adv. Dkt. 44 (Declaration of Robert Mayer, Structural Engineer). Mayer identified a series of recommended repairs, but did not conclude that the Property suffers from any major structural damage.

On cross-examination, Mayer admitted that in preparing his report he relied on over 100 photographs taken by his associate, who is trained as architect, rather than inspecting the Property himself (as stated in his declaration). Mayer testified that for approximately two and one-half years, due to physical difficulties walking, Mayer has relied on this associate to assist him with inspections in this manner, somewhere between 50 and 100 times. Mayer further testified that he has trained and directed his associate how to spot the issues and take the photographs Mayer deems necessary to prepare his structural engineering analyses. *See* Transcript, February 1, 2017 at 32:17-35:8.

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

Initially, CNF's structural engineering expert, Khorin Salmassian, testified that this was not an appropriate methodology to conduct a structural engineering assessment. When pressed, however, Salmassian admitted that it might be appropriate to conduct an assessment in this manner if the individual taking photographs at the engineer's direction had a "professional background." The undisputed testimony is that Mayer's associate has a background in architecture. The Court concludes that this is adequate to corroborate Mayer's testimony that the inspection, report and expert opinion were prepared pursuant to an acceptable methodology—and concludes that Mayer's opinion was competent and credible.

The only evidence of value offered by City National was that of Jamal Dawood, who is a loss mitigation officer. Dawood testified that at the time CNF and the private investor who funded the loan were considering whether to finance Harutyunyan's purchase of the Property for $600,000, Dawood obtained a land-only appraisal placing a value on the land of $700,000. From the perspective of CNF and its investor, this sort of appraisal may have been sufficient to assess their downside risk. But for present purposes, even if admissible, it would be incomplete (and of limited probative value), because it does not take into consideration the value of the home located on the Property.

Furthermore, the contention that there is no equity value in the Property is undermined by Dawood's own testimony regarding his business assessment at the time the loan was made. At the TRO Hearing, Dawood described what he told his investor regarding the opportunity presented by the loan to Harutyunyan. As he explained, his view was that there was $300,000 to $400,000 of value to unlock from this property if Harutyunyan defaulted, even after the alleged structural problems were repaired:

> [A]t the end of the day, if she fails on every part of every promise, I asked the investor, I said, look, you're going to be okay with 700,000 -- 750,000 like because you could always rebuild this property, put another let's say 500- into it and you're in it at 700- let's say, hard -- I'm talking hard-hard. 700- plus 500- is 1.2. You could sell it for 1.7-. So you make 3-, 400,000, but you have [expense] and you got to maintain the loan and you got to put 500- into it to make your 3-, 400,000. There's no free lunch obviously.

Transcript, December 28, 2016 at 114:25-115:10.

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1    At the Injunction Hearing, CNF offered Salmassian to testify as a rebuttal witness that the

2    Property needs substantial structural repairs in the amount of $710,000, in addition to an

3    unspecified amount in cosmetic repairs.  This testimony did not persuade the Court that there is no

4    equity in the Property.  First, Salmassian did not provide testimony (expert or otherwise) on the

5    value of the Property.  The only evidence of value offered by CNF was the Dawood analysis

6    quoted above, under which $710,000 in repairs (rather than $500,000) would still leave several

7    hundred thousand dollars in equity.

8    Second, on cross-examination at the Injunction Hearing, Salmassian admitted that the

9    structural problems that he viewed as "necessary" did not render the house inhabitable, life-

10   threatening, or potentially catastrophic, as had been suggested by CNF at the TRO Hearing.  *See*

11   Transcript, February 1, 2017 at 109:23-110:2 ("Yes, it is habitable.  I mean nobody is going to get

12   killed in there but that doesn't mean, you know, that the house hasn't distorted to a point where

13   cracks have to be constantly repaired and redone.").  Thus, although Salmassian testified to an

14   elaborate and expensive plan for "stabilizing" the Property, and although such a plan may be

15   desirable to some owners of the property, the Court is not persuaded that the improvements he

16   recommended were required to preserve the existing value of the Property.  Indeed, the Plaintiff's

17   expert engineer, Mayer, did not find evidence of the same structural deficiencies that Salmassian

18   did.  Accordingly, the Court is not persuaded that the deficiencies Salmassian described render the

19   Property devoid of any equity value.

20   **IV.  LEGAL STANDARDS**

21   Courts generally grant equitable relief when there is a prospect of irreparable injury and

22   legal remedies are inadequate.  *See Stanley v. Univ. of S. Cal,* 13 F.3d 1313, 1319 (9th Cir. 1994);

23   *see also Weinberer v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  A preliminary injunction is "an

24   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to

25   such relief."  *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 375 (2016) (citing

26   *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)).

27   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

28   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

17

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1  balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (citing

2  *Winter*, 555 U.S. at 20).  A plaintiff must make a showing as to each of these elements, although in

3  the Ninth Circuit "if a plaintiff can only show that there are 'serious questions going to the

4  merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction

5  may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two

6  *Winter* factors are satisfied." *Id.* (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281,

7  1291 (9th Cir. 2013).[13]

8       Where there are multiple claims asserted, the plaintiff need only show a likelihood of

9  success and irreparable harm with respect to one of those claims.  *See Finance Exp. LLC v.*

10  *Nowcom Corp.*, 564 F.Supp. 2d 1160, 1168 (C.D. Cal. 2008); *C&C Props., Inc. v. Shell Co.*, 2015

11  WL 5604384 (E.D. Cal., Sept. 23, 2015) at *4, *report and recommendation adopted,* December 3,

12  2015.  However, there must be a nexus between the relief that is likely to be granted under the

13  complaint and the injunctive relief that is requested.  *See Pacific Radiation Oncology, LLC v.*

14  *Queen's Med. Ctr.,* 810 F.3d 631, 636 (9th Cir. 2015).  "The relationship between the preliminary

15  injunction and the underlying complaint is sufficiently strong where the preliminary injunction

16  would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De*

17  *Beers Consol. Mines,* 325 U.S. 212, 220 (1945)); *see also Eisenberg v. Citibank NA* (C.D. Cal.,

18  Nov. 29, 2016) 2016 WL 6998559, at *3.

19       Due to the exigent nature of a preliminary injunction, "a court may properly consider

20  evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods*

21  *Co.*, 2015 WL 3930041, at *3.  The Court has discretion to "weigh [this] evidence as required to

22

23

---

[13]  In other words, "'serious questions going to the merits' and a balance of hardships that tips
sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the
plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the
public interest." *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).
"Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for
litigation and thus for more deliberative investigation.'" *Repub. of the Phil. v. Marcos*, 862 F.2d
1355, 1362 (9th Cir. 1988) (citations omitted).

28

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

reflect its reliability." *Dr. Seuss Ents.v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996).

## V. DISCUSSION

### A. Likelihood of Success

#### 1. Fraudulent Transfer of the Property

The Court finds that the Plaintiff is likely to succeed on his fraudulent transfer claim and recover the Property, on the basis that the Property was fraudulently transferred from the Debtor to Virginia, and thereafter from Virginia to Harutyunyan.

California has adopted the Uniform Fraudulent Transfer Act. *See* Cal. Civ. Code §§ 3439–3439.12. The purpose of the Act is "'to prevent debtors from placing property which legitimately should be available for the satisfaction of demands of creditors beyond their reach....'" *Chichester v. Mason,* 43 Cal.App.2d 577, 584 (1941). Civil Code section 3439.04 provides two alternative theories of establishing a fraudulent transfer: actual fraud or constructive fraud. The Court finds that Plaintiff is likely to succeed on a theory of actual fraud.[14]

"Actually fraudulent transfers are avoidable under UFTA by present and future creditors." *In re Beverly,* 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007, *aff'd in part,* 551 F.3d 1092 (9th Cir. 2008). Actual fraud is a transfer made with "actual intent to hinder, delay or defraud any creditor of the debtor." *See* Cal. Civ. Code § 3439.04(a)(1). "Any of the three—intent to hinder, intent to delay, or intent to defraud—qualifies a transfer for UFTA avoidance, even if adequate consideration is paid by someone other than a good faith transferee for reasonably equivalent value." *In re Beverly,* 374 B.R. at 235.

---

[14] Because a plaintiff need only succeed on one theory to establish a fraudulent transfer claim, the Court finds it unnecessary to analyze the likelihood that plaintiff would succeed under a theory of constructive fraudulent transfer. *See Monastra v. Konica Business Machines U.S.A., Inc.* 43 Cal.App.4th 1628, 1635 (1996) (Section 3439.04 is construed to mean a transfer is fraudulent if the provisions of either subdivision (a)(1) or subdivision (a)(2) are satisfied); *Lyons v. Security Pacific Nat. Bank* 40 Cal.App.4th 1001, 1020 (1995) (same).

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1    Whether there is actual intent to hinder, delay, or defraud under the UFTA is a question of

2   fact to be determined by a preponderance of evidence.  *Id.* (citing California authorities).  Because

3   "direct evidence of intent to hinder, delay or defraud is uncommon, the determination typically is

4   made inferentially from circumstances consistent with the requisite intent."  *Id.* at 235; *see also In*

5   *re Village Concepts, Inc.,* 2015 WL 803-974 at *11.  The eleven factors listed in the UFTA as

6   probative of intent—the so-called "badges of fraud"—are not exclusive.  "A trier of act is entitled

7   to find actual intent based on the evidence in the case, even if no "badges of fraud" are present.

8   Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a

9   number of badges of fraud.  *In re Beverly,* 374 B.R. at 236 (citing California authorities).

10    Plaintiff has made a clear showing that he is likely to succeed on his non-dischargeability

11   claims against the Debtor, who largely asserted his Fifth Amendment privilege against self-

12   incrimination when questioned at the Injunction Hearing.  More importantly, Plaintiff has made a

13   clear showing that he is likely to succeed on his fraudulent transfer claims that seek to recover the

14   Property.  The evidence is circumstantial but indicates overwhelmingly that the Property was

15   transferred from the Debtor to his wife, Virginia, and from Virginia to Harutyunyan, with the intent

16   to hinder, delay and/or defraud the Debtor's creditors.  The Debtor's transfer of the Property to his

17   wife, the filing of a bankruptcy falsely claiming that the Property still belonged to him, the use of

18   the bankruptcy case to strip off judgments against the Property, Virginia's negotiation of short sale

19   approvals, the subsequent short sale of the Property to Harutyunyan, and the leaseback of the

20   Property to the Martirosians, were all part of elaborate strategy to shelter the Property from the

21   Debtor's creditors and place it in the hands of a friendly buyer who ultimately would return it to the

22   Martirosians.

23    The circumstantial evidence likewise is substantial that Harutyunyan is not an arm's length

24   purchaser and is working in collusion with the Debtor and his wife.  This evidence includes the

25   following: (i) Harutyunyan did not have the financial wherewithal to purchase and improve the

26   Property, or even to make a down payment on the loan from CNF, (ii) Harutyunyan incurred a

27   monthly interest payment obligation to CNF of over $6,800 as to which she did not have the ability

28   to pay on her own, (iii) during those months in which interest payments were made to CNF,

20

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1  Harutyunyan obtained the funds necessary to make those payments from Virginia,

2  (iv) Harutyunyan and Virginia attempted (unsuccessfully) to disguise the source of the funds by

3  going to Wells Fargo each month to purchase, with cash, a cashier's check that identified

4  Harutyunyan as the remitter and referenced her account for Excelente, Inc., (v) months before she

5  actually purchased the Property in a short sale, Harutyunyan created a corporate entity with the

6  address of the Property as its name, (vi) Harutyunyan never used the corporate entity for its stated

7  purpose, (vii) Harutyunyan leased the Property back to Virginia for $2,200 per month, an amount

8  prescribed by Virginia and not based on any market considerations, (viii) Harutyunyan testified that

9  she accepted the rent in cash (which is difficult to trace) but produced no documentary evidence

10  substantiating receipt of these monthly payments, (ix) Harutyunyan and/or her son hold title to a

11  Mercedes-Benz that is used by Virginia and which is paid for by Virginia through the Excelente,

12  Inc. account, (x) Harutyunyan has the bank statements for the Excelente, Inc. account mailed to the

13  Property, where Virginia lives, rather than to Harutyunyan's home in Hollywood, and (xi) the

14  DWP bill, which is the responsibility of the Martirosians, was altered to name Harutyunyan, even

15  though she does not live at the Property or use the utilities there.

16      For all these reasons, the Court concludes that the Plaintiff is likely to succeed in proving at

17  trial that the Property was fraudulently transferred with the intent to hinder, delay and/or defraud

18  creditors and therefore is recoverable.  Although injunctive relief freezing an asset typically is not

19  available to ensure the collectability of a judgment (i.e., before the plaintiff has an interest in the

20  subject property), the Supreme Court has recognized an exception to this rule with respect to

21  fraudulent conveyances and bankruptcy and other causes of action seeking equitable relief.  *See*

22  *Grupo Mexicano,* 527 U.S. 308, 322 (1999); *In re Focus Media Inc.*, 387 F.3d 1077, 1084–85 (9th

23  Cir. 2004).  The fraudulent transfer claim here is just such a cause of action.  Plaintiff seeks

24  recovery of property because it was fraudulently transferred to hinder, delay or defraud creditors.

25  Injunctive relief is appropriate in this circumstance to preserve the status quo pending final

26  adjudication of that claim.

27

28

## 2.      Wrongdoing by CNF

CNF argues that even if the Court finds that the Property likely is recoverable as a fraudulent transfer based on the wrongdoing of the Debtor, Virginia and Harutyunyan, the Court should not grant injunctive relief because the Plaintiff has not shown a likelihood of success on its one and only claim against CNF for cancellation of instruments.  CNF contends that the Court should not grant injunctive relief that prevents CNF from foreclosing on its deeds of trust against the Property because Plaintiff has failed to show that CNF is liable for any wrongdoing in connection with the granting of those deeds of trust.  This argument fails for two independently sufficient reasons.

First, CNF's argument misconstrues the requirements for granting injunctive relief.  There is no requirement of a likelihood of success on every claim stated in a complaint, or against every defendant named in a complaint.  Plaintiff need only demonstrate that he is likely to succeed on one of the claims in the complaint, see *Finance Exp. LLC v. Nowcom Corp.*, 564 F.Supp. 2d at 1168; *C&C Props., Inc. v. Shell Co.*, 2015 WL 5604384,*4, and that there is a nexus between the claim that is likely to succeed and the injunctive relief requested.  *See Pacific Radiation Oncology, LLC v. Queen's Med. Cen.,* 810 F.3d at 636.  That is precisely the case here.  Plaintiff has demonstrated a likelihood of success on his claims to recover the Property as a fraudulent transfer.  The requested injunctive relief seeks to prevent a foreclosure sale of the Property, because such a sale might make it impossible to recover the Property.  *See* Section V.B. below.  That CNF asserts two deeds of trust against the Property is of no moment.  Even if it is assumed that Plaintiff is not successful in removing the deeds of trust from the Property, the existence of those deeds of trust does not preclude recovery of the Property.  The Property can be recovered for the benefit of a creditor *subject* to existing deeds of trust.  Thus, injunctive relief would be appropriate here even if Plaintiff had never asserted a claim against CNF.

Second, while the Court does not believe that Plaintiff can assert a cause of action against CNF for cancellation of the deeds of trust against the Property, the evidence adduced to date raises serious questions whether CNF colluded with the Debtor, Virginia and Harutyunyan and is therefore liable in some measure to Plaintiff.  Cancellation of an instrument is an action under

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1   California Civil Code section 3412 to cancel written instruments clouding title.  A plaintiff

2   "'without any title or interest in the property cannot maintain' a cause of action for cancellation."

3   *Vaughn v. Alamin, Inc.*, 2010 WL 2655418, *8 (Cal. Ct. App., July 6, 2010) quoting *Osborne v.*

4   *Abels*, 30 Cal. App. 2d 729, 731 (1939); *see also* 12 Miller and Starr, *Cal. Real Est*. § 40:113 (4th

5   ed.) ("A person who does not have an interest in a parcel of real property cannot bring an action to

6   cancel a deed or mortgage regarding the property.  To bring such an action, the plaintiff must have

7   an interest in the parcel affected by the instrument.")  Plaintiff has not alleged and does not contend

8   that he holds an interest in the Property, only that it is recoverable for his benefit, as a creditor of

9   the Debtor.  Thus, Plaintiff is not likely to succeed on his cancellation of instruments claim.

10          However, the Court would be remiss if it did not observe that the evidence adduced at the

11   TRO Hearing and the Injunction Hearing raises serious questions whether CNF is liable for civil

12   conspiracy in connection with the fraudulent transfer scheme.  California courts permit a creditor to

13   recover civil damages from those who conspire to transfer property of a debtor to hinder, delay, or

14   defraud creditors under a theory of civil conspiracy.  See *Qwest Commc'ns. Corp. v. Weisz*, 278

15   F.Supp.2d 1188, 1192 (S.D.Cal.2003) (applying California law); *Gutierrez v. Givens*,  989 F.Supp.

16   1033, 1044 (S.D.Cal.1997) (applying California law); *Monastra v. Konica Bus. Mach., U.S.A .,*

17   *Inc.*, 43 Cal.App.4th 1628, 1644-45 (1996); *Wyle v. Howard, Weil, Labouisse, Friedrichs, Inc.* (*In*

18   *re Hamilton Taft & Co).*, 176 B.R. 895, 902 (Bankr. N.D. Cal.), *aff'd*, 196 B.R. 532 (N.D. Cal.

19   1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997) (citing *Taylor v. S & M Lamp Co.,* 190 Cal.App.2d 700,

20   706 (1961) ("liability for conspiracy to commit a tort has long been recognized in this state");

21   *Cardinale v. Miller*, (Cal. Ct. App., May 17, 2010) 2010 WL 1952423, at *4..

22          The elements of civil conspiracy are: (1) formation and operation of the conspiracy (an

23   agreement to commit wrongful acts); (2) damage resulting to plaintiff; and (3) from an act done in

24   furtherance of the common design.  *See Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d

25   862, 881 (N.D. Cal. 2010) (citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503,

26   510-11 (1994)).  Generally, California law also requires that the conspirator owe "the victim a duty

27   not to commit the underlying tort."  *In re Yahoo! Litig.*, 251 F.R. D. 459, 474 (C.D. Cal. 2008)

28   (citing *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp. 2d 1101, 1133 (C.D. Cal. 2003)).  This

1  prerequisite of a duty to the plaintiff, however, does not apply if the conspirator has actual

2  knowledge of the debtor's fraudulent transfer scheme.  In *Cardinale v. Miller*, a judgment creditor

3  sued her judgment debtor for concocting a fraudulent transfer scheme by obtaining loans on

4  properties that he controlled through sham entities, and converting the loan proceeds to his personal

5  use.  Then the debtor either paid off prior loans secured by the properties at a discount without

6  recording a reconveyance (so that creditors believed the properties had no equity); or, having

7  converted the equity to cash, he allowed the loans to default and the properties to be sold at

8  foreclosure.  The plaintiff also sued a mortgage broker and its agents for conspiracy to effect

9  fraudulent transfers, alleging that the broker conspired with the debtor, knew about the scam, and

10  knew that there "was almost no possibility the loans would ever be repaid." *Cardinale*, at *2.  On

11  demurrer the mortgage broker and its agents argued "a lender has no legal duty to protect the

12  interests of its borrowers' creditors or police the moral conduct of its borrowers." *Cardinale*, at *5.

13  While acknowledging this general principal, the court summarily rejected their conclusion that a

14  lender could not be held liable: "True, but that does not mean a lender (or broker) is free to

15  knowingly conspire with a judgment debtor in a scheme to defraud the debtors' creditors. The law

16  has been quite clear in this regard for almost 50 years." *Id*. citing *Taylor*, supra and *Qwest*, supra.

17      The testimony provided by Dawood in opposition to the injunctive relief raises issues about

18  the extent of CNF's knowledge, assistance and participation in the fraudulent scheme to transfer

19  the Property to Harutyunyan.  As noted, CNF provided the financing enabling Harutyunyan to

20  purchase the Property at a short sale.  At the TRO Hearing, Dawood testified that when first

21  approached about lending to Harutyunyan, he thought the deal was too good to be true: i.e., lenders

22  with deeds of trust on a house nominally worth $1.8 million agreeing to a short sale for $600,000.

23  Dawood testified that after conducting some due diligence on the house he came to believe that the

24  transaction was legitimate.  But the Court was not persuaded by Dawood's testimony and generally

25  did not find him credible.

26      Dawood facilitated a six-month loan to Harutyunyan to acquire the Property.  Dawood

27  testified that he was advised at the time that if the buyer did not make the recommended

28  improvements to stabilize the property and establish a retaining wall, he (or his investor) would

1   have difficulty selling the Property following a default.  *See* Transcript, December 27, 2016 at

2   55:14-55:25.  CNF's expert engineer testified that those improvements would cost as much as

3   $710,000.  *See* Transcript, February 1, 2017 at 135:19-136:2.   But Harutyunyan did not have that

4   kind of money and Dawood knew it.  Harutyunyan likewise did not have the $200,000 down

5   payment on her short sale purchase, or the additional $108,000 in fees and impounds that Dawood

6   testified CNF lent her for that purpose.  She also did not have the resources to make the monthly

7   interest payments of over $6,800 that were due to CNF.  Nevertheless, Dawood approved the loan.

8   The Court finds it unlikely that he would have done so without assurances that the Martirosians

9   would be funding those payments and knowledge that the short sale to Harutyunyan was part of the

10  Martirosians' fraudulent transfer scheme.

11      These circumstances raise serious questions as to whether CNF may be liable to Plaintiff

12  either under a theory of civil conspiracy.  The seriousness of those questions is underscored by

13  Dawood's notable lack of candor about his initial meeting with Harutyunyan.  At the TRO Hearing,

14  in which neither Virginia nor Harutyunyan were offered as witnesses, Dawood testified extensively

15  about his initial meeting with Harutyunyan.  He testified that she was anxious, disheveled and met

16  with him alone. *See* Transcript, December 27, 107 at 52:18-53:2, 82:4-9, 84:23-85:10.  He also

17  testified that Harutyunyan spoke to him in English.  *Id*., at 84:3-17.  At the Injunction Hearings

18  held weeks later, both Virginia and Harutyunyan testified that they met with Dawood together and

19  that Virginia served as an interpreter.  *See* Transcript, February 1, 2017 at 59:14-60:21 and

20  Transcript, February 13, 2017 at 8:24-9:10, 9:25-10:1.

21      The Court found the testimony of Virginia and Harutyunyan credible on these points and

22  Dawood's prior testimony not credible.  The Court concludes that Dawood attempted to conceal

23  Virginia's presence at the initial meeting with Harutyunyan because her presence there would

24  implicate his knowledge and participation in the fraudulent transfer scheme.  The Court finds that

25  Dawood falsely testified about Harutyunyan's ability to speak English for a similar reason: he did

26  not want to reveal Virginia's role as a participant in discussions about the CNF loan.  Further,

27  Dawood's testimony that Harutyunyan appeared disheveled and anxious makes no sense and

28  suggests that it was fictional.  Harutyunyan was not a homeowner facing foreclosure.  She was not

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

1    a person desperate to save her home from forfeiture.  She had no reason to be anxious and

2    disheveled.  She purportedly was interested in buying the Property and earning a profit, but she was

3    not facing the potential loss of her home.  If anyone was anxiuos, it would have been Virginia, who

4    was facing the potential loss of her home.

5         As noted above, the Court does not need to conclude that CNF committed wrongdoing as a

6    prerequisite to the injunctive relief requested.  But if that were a prerequisite, Plaintiff has amply

7    demonstrated that there are serious questions going to CNF's knowledge, participation and

8    facilitation of the fraudulent transfer scheme, and its consequent liability under a conspiracy theory.

9    This showing would be sufficient under the Ninth Circuit's alternative test to justify relief in favor

10   of Plaintiff because the balance of hardships tips sharply in Plaintiff's favor, as discussed more

11   fully below.  *See* Section V.C. below.

12   **B.  Irreparable Harm**

13        Plaintiff will suffer irreparable harm if the foreclosure sale is not enjoined.  If the CNF

14   foreclosure sale proceeds, there is a risk that the Property will be sold to a purchaser that takes it in

15   good faith and for reasonably equivalent value within the meaning of the California Civil Code,

16   thereby precluding recovery by Plaintiff.  *See* Cal. Civ. Code § 3439.08(a),  This would, in essence,

17   destroy Plaintiff's claim for relief and his right to recover the Property.  That is the very definition

18   of irreparable injury.  CNF has suggested that there can be no irreparable harm because there is no

19   equity in the Property to recover.  But for the reasons discussed in greater detail above, the Court

20   rejects this argument.  It appears that there is substantial equity in the Property and that value may

21   be lost irreparably if the foreclosure sale is permitted to proceed.

22   **C.  Balance of Equities**

23        The balance of hardships tips sharply in favor of Plaintiff.  By granting a preliminary

24   injunction against the foreclosure sale, CNF may be inconvenienced and may experience a delay in

25   realizing on its collateral.  But if it is entitled to keep its deeds of trust against the Property, CNF

26   will be protected by the value in that Property.  By contrast, if the foreclosure sale is permitted to

27   proceed and Plaintiff's right to recover the Property is extinguished, Plaintiff gets nothing and will,

28   as a practical matter, be denied any remedy.

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**

**D.  The Public Interest.**

The public interest strongly favors granting injunctive relief here.  It is in the public interest to prevent the loss of a cause of action by an injured party stemming from a debtor's fraudulent conduct.  Indeed, it would be against public policy to do otherwise.  CNF suggests that there is a public interest in permitting lenders to foreclose on their liens in accordance with their legal rights.  The Court does not disagree.  This interest, however, must yield to the public interest in preventing and remedying fraudulent conduct.

**E.  Request for a Bond**

CNF requests that the Plaintiff post a bond as security.  Federal Rule of Civil Procedure 65(c) permits the issuance of a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Court concludes that CNF already has adequate security by virtue of its deeds of trust against the Property.  As discussed above, there is substantial equity value in the Property above the amount of the claims asserted by CNF.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

27

## VI.  CONCLUSION

For all these reasons, the Court concludes that issuance of the preliminary injunction requested by the Plaintiff is appropriate.

###

Date: March 14, 2017

Martin R Barash
United States Bankruptcy Judge

**MEMORANDUM OF DECISION RE: PRELIMINARY INJUNCTION**